UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ROGER WONG,

      Plaintiff,

      v.

DIGITAS, INC.,

      Defendant.

No. 3:13-CV-00731 (MPS)

## MEMORANDUM OF DECISION

Plaintiff Roger Wong ("Mr. Wong") filed an amended complaint (Amend. Compl. [Doc. # 30]) against his former employer, Defendant Digitas, Inc. ("Digitas"), for breach of contract (Count One) and breach of the implied covenant of good faith and fair dealing (Count Two) arising out of Digitas's February 2012 termination of his employment.[1] Pending before this Court is Digitas's motion for summary judgment [Doc. # 31]. Mr. Wong opposes the motion, arguing that there are genuine issues of material fact regarding whether Digitas was bound by contract to follow procedures in its Anti-Harassment Policy (the "Policy"), and whether it breached the Policy, and thus its contractual obligations, by failing to interview Mr. Wong before terminating his employment.

Because they are required by law, anti-discrimination and anti-harassment policies of the type Mr. Wong relies on generally do not create enforceable contracts. *See Byra-Grzegorczyk v. Bristol-Myers Squibb Co.*, 572 F. Supp. 2d 233, 254 (D. Conn. 2008); *Peralta v. Cendant Corp.*,

---

[1] Mr. Wong filed his original complaint on May 8, 2013, in the Superior Court for the Judicial District of Stamford/Norwalk, alleging race and national origin discrimination in violation of the Connecticut Fair Employment Practices Act (Conn. Gen. Stat. §§ 46a-60(a)(1) and 46a-60(a)(5)) and Title VII of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000e-2(a) and 1981), as well as a claim for breach of contract. Digitas removed the case to federal court on May 20, 2013. (Notice of Removal [Doc. # 1].) On May 5, 2014, Mr. Wong filed an amended complaint dropping his federal and state discrimination claims and adding a claim for breach of the covenant of good faith and fair dealing. (Amend. Compl. [Doc. # 30].) The Court retains jurisdiction under 28 U.S.C. § 1332 because of the diversity of the parties.

123 F. Supp. 2d 65, 84 (D. Conn. 2000). But even if the Court were to treat the Policy like an employment handbook or personnel manual that could form an enforceable contract, the Policy is consistent with Mr. Wong's offer letters from Digitas and the Digitas Employee Handbook (the "Handbook"), and does not alter the at-will relationship between the parties clearly set forth in those documents. Because Mr. Wong has failed to show the existence of a contract that altered his at-will employment relationship or required that Digitas interview him before terminating him, his breach of contract claim (Count One) fails as a matter of law. His claim for breach of the covenant of good faith and fair dealing (Count Two) also fails. To show that an employer breached the covenant of good faith and fair dealing with respect to an at-will employee, the employee must show that he was discharged in violation of an important public policy. But Mr. Wong does not even allege that his discharge violated any public policy. Therefore, the Court GRANTS Digitas's motion for summary judgment.

**I.     BACKGROUND**

Digitas "is an advertising, marketing and brand strategy corporation, incorporated in Massachusetts" (Pl.'s Opp. Br. [Doc. # 34] at 6), with its principal place of business in Massachusetts. (Def.'s Response to Pl.'s Mot. to File Amend. Compl. [Doc. # 28] at 3.) Mr. Wong, a New York resident, began working for Digitas in December 2008 as a term employee without benefits. (Seltzer Aff. Ex. B [Doc. # 31-3] at 9.) In June 2009, Mr. Wong became an Associate Creative Director, which was a full-time position that included benefits. (Seltzer Aff. Ex. A [Doc. # 31-3] at 5-6.) Within a year, Mr. Wong was promoted to Vice President and Director, Creative. (Amend. Compl. [Doc. # 30] ¶ 9.) Mr. Wong reported to Jesse Vendley ("Mr. Vendley"), Senior Vice President, Creative. (Pl.'s L.R. 56(a)(2) Stmt. [Doc. # 34-2] ¶ 8.)

In January 2012, Mr. Wong and a team of Digitas employees were on location in California working on a commercial shoot for Comcast, one of Digitas's clients. (Pl.'s L.R. 56(a)(2) Stmt. [Doc. # 34-2] ¶¶ 18-19.) On January 31, 2012, during the shoot, Mr. Wong and Heather Greaux ("Ms. Greaux"), Senior Motion Media Producer for Digitas, had a disagreement on the set and later exchanged text messages about their disagreement, and about whether Mr. Wong would drive Ms. Greaux to the set the next morning. That night, Mr. Wong sent a text message to Peter McCann ("Mr. McCann"), Executive Producer, Comcast Account, requesting that he not be required to work with Ms. Greaux in the future. (Pl.'s Opp. Br. Ex. F [Doc. # 34-5] at 135-38.) Also that night, Ms. Greaux sent an e-mail to her supervisors—Steve Torrisi ("Mr. Torrisi"), Senior Vice President, Global Head of Production, and Mr. McCann—complaining about Mr. Wong's behavior toward her on the set and during their exchange of text messages. (Pl.'s L.R. 56(a)(2) Stmt. [Doc. # 34-2] ¶ 25; Seltzer Aff. Ex. J [Doc. # 31-6] at 6-7.) In her e-mail, Ms. Greaux described Mr. Wong's "unprofessional" and "abusive" behavior (Seltzer Aff. Ex. J [Doc. # 31-6] at 6-7), lodged a formal complaint against Mr. Wong, and requested that she no longer be required to work with him. (Pl.'s L.R. 56(a)(2) Stmt. [Doc. # 34-2] ¶ 26.) Mr. Torrisi contacted Human Resources, which assigned Mark Murata ("Mr. Murata"), Senior Vice President, to investigate Ms. Greaux's complaint. (*Id.* ¶ 27.)

During Mr. Murata's investigation he examined e-mails and text messages and spoke to Ms. Greaux, Sarah Kearney (Associate Director, Marketing), Mr. McCann, Mr. Torrisi, Mr. Vendley, and Mr. Vendley's supervisor, Matt D'Ercole (Executive Vice President, Creative). (Pl.'s L.R. 56(a)(2) Stmt. [Doc. # 34-2] ¶ 29.) Mr. Murata did not interview Mr. Wong. (*Id.* ¶ 34.). Based on his investigation, Mr. Murata decided to terminate Mr. Wong's employment, and did so on February 10, 2012. (*Id.* ¶ 34.)

3

Additional undisputed facts are set forth below in the discussion of the parties' arguments.

## II. STANDARD

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (internal quotation marks and citation omitted).

## III. DISCUSSION

### A. Breach of Contract Claim (Count One)

Mr. Wong argues that his employment was governed in part by Digitas's Anti-Harassment Policy (the "Policy"), which, he claims, modified the at-will relationship between him and Digitas and imposed a contractual obligation on Digitas "to investigate all harassment complaints and interview both the complainant and the accused involved in the alleged harassment." (Pl.'s Opp. Br. [Doc. # 34-1] at 10.) Mr. Wong contends that Digitas violated the Policy—and therefore breached its contract with him—by "relying solely on the complaining party," and not interviewing Mr. Wong before terminating him. (*Id.*)

"[A]ll employer-employee relationships not governed by express contracts involve some type of implied contract of employment. There cannot be any serious dispute that there is a bargain of some kind; otherwise, the employee would not be working." *Gaudio v. Griffin Health Servs. Corp.*, 249 Conn. 523, 532 (1999) (internal quotation marks and citations omitted). In Connecticut, it is the general rule that "contracts of permanent employment, or for an indefinite term, are terminable at will." *Sheets v. Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 474 (1980). This general rule "can be modified by an agreement of the parties." *Schermerhorn v. Mobil Chem. Co.*, No. 3:99 CV 941 (GLG), 2001 WL 50534, at *4 (D. Conn. Jan. 9, 2001).

To show that an employer and an employee agreed to modify an at-will employment relationship, "a plaintiff must prove that the employer had agreed, either by words or action or conduct, to undertake some form of actual contractual commitment" inconsistent with the at-will relationship. (*Id.*) Mr. Wong does not allege that Digitas made any verbal representations to him—at any time during his employment at Digitas—that would modify the at-will relationship or obligate Digitas to interview certain people before terminating him.

The Court thus examines the Policy as well as the other documents evidencing the relationship between Mr. Wong and Digitas to determine whether there is a genuine issue of material fact as to whether Mr. Wong's at-will employment was modified by the language of the Policy.[2]

---

[2] Mr. Wong's related argument that Digitas followed the Policy with respect to another employee accused of harassment by interviewing him and giving him verbal warnings (Pl.'s Opp. Br. [Doc. # 34-1] at 25) is not sufficient to show a "meeting of the minds" between him and Digitas that it would follow the Policy with respect to him. *Cardona v. Aetna Life & Cas.*, No. 3:96CV1009 (GLG), 1998 WL 246634, at *6 (D. Conn. May 8, 1998). "[C]ontracts are not created by evidence of customs and usage." *Reynolds v. Chrysler First Commercial Corp.*, 40 Conn. App. 725, 732 (1996) (internal quotation marks and citations omitted). Mr. Wong fails to meet "his burden to establish that adherence to these policies and procedures was the result of a contractual commitment by the defendant." *Id.*

**1. Offer Letters**

Mr. Wong began working for Digitas in December 2008 as a term employee without benefits (Seltzer Aff. Ex. B [Doc. # 31-3] at 9.) Mr. Wong's December 19, 2008 offer letter stated that "joining Digitas is contingent upon filling out" certain forms, including the Policy. (Seltzer Aff. Ex. B [Doc. # 31-3] at 8.) Both Mr. Wong's December 19, 2008 offer letter for the "term employee" position, and his June 15, 2009 offer letter for Associate Creative Director, provided that his employment would be "at-will," that he "may be terminated by either" party "at any time and for any reason, without notice," and that "[n]othing in this offer letter shall be construed to guarantee [his] employment for a fixed or indefinite term." (Seltzer Aff. Ex. B [Doc. # 31-3] at 5-6, 8-9.) These offer letters were addressed to Mr. Wong and identified his salaries and supervisors. On each offer letter, Mr. Wong signed beneath a statement that read, "I have read and understand the foregoing offer of employment. In accepting this offer, I acknowledge that I will be an at-will employee of Digitas and that the foregoing terms of employment may be subject to change." (Seltzer Aff. Ex. B [Doc. # 31-3] at 6, 9.)

Mr. Wong asked his supervisor, Mr. Vendley, if he "could get a letter that actually stipulated a contract" that was not at-will. But Mr. Vendley told Mr. Wong that only "senior partners" were able to get such contracts, and that Mr. Vendley had tried unsuccessfully to negotiate such a contract for himself. (Wong Tr. [Doc. # 31-4] at 80.). Mr. Wong also attempted to "get a contract [that] stipulated at least a year or two [of] guaranteed work" that was not at-will, but he was unable to do so. (*Id.* at 81.)

Mr. Wong accepted the offer for Associate Creative Director by signing the offer letter on June 15, 2009. (Pl.'s L.R. 56(a)(2) Stmt. [Doc. # 34-2] ¶ 4.) He "fully understood at the time he accepted Digitas'[s] offer of employment that his employment was at-will." (*Id.* ¶ 5.) Mr.

Wong understood at-will employment to mean that "at any point Digitas could terminate my employment, as well as I could terminate my employment at any time." (Wong Tr. [Doc. # 31-4] at 81.) Within a year, Mr. Wong was promoted to Vice President and Director, Creative. (Amend. Compl. [Doc. # 30] ¶ 9.) There is no evidence that Mr. Wong's at-will status changed when he was promoted.

Thus, definitive contract language in the offer letters repeatedly states that Mr. Wong's employment is at-will and terminable by any party, for any reason, at any time. It is also clear from Mr. Wong's deposition testimony and his attempts to negotiate a contract that guaranteed several years of work that he understood the relationship was at-will.

### 2. The Employee Handbook

Statements in an employee handbook or personnel manual, "under appropriate circumstances, may give rise to an express or implied contract between employer and employee." *Finley v. Aetna Life & Cas. Co.*, 202 Conn. 190, 198 (1987) *overruled in part on other grounds, Curry v. Burns*, 225 Conn. 782 (1993). "By eschewing language that could reasonably be construed as a basis for a contractual promise, or by including appropriate disclaimers of the intention to contract, employers can protect themselves against employee contract claims based on statements made in personnel manuals." *Id.* at 199 n. 5. However, "[e]ven when a handbook contains a disclaimer of contractual intent, contradictory statements by the employer can lead to liability." *Thompson v. Revonet, Inc.*, No. 3:05-CV-168 (RNC), 2005 WL 3132704, at *2 (D. Conn. Nov. 21, 2005). "[W]hether a personnel manual or employee handbook gives rise to an enforceable contract, interpreting all inferences in a light most favorable to the plaintiff, is a question of law for the Court." *Cardona v. Aetna Life & Cas.*, No. 3:96CV1009 (GLG), 1998 WL 246634, at *5 (D. Conn. May 8, 1998). It is only "[i]n the

absence of definitive contract language" that "the determination of what the parties intended is generally treated as a question of fact to be decided by a jury." *Id.* at *2.

Digitas maintained an Employee Handbook (the "Handbook") for its U.S. employees. (Pl.'s L.R. 56(a)(2) Stmt. [Doc. # 34-2] ¶ 9.) The February 2012 version of the Handbook contains clear, express, and repeated disclaimers of any intention to create anything other than an at-will relationship. The introduction to the Handbook states:

> The contents of this Handbook are guidelines only and supersede any prior handbook or policy. The company has the right, with or without notice, in an individual case or generally, to modify its interpretation of and/or change any of its guidelines, policies, practices, working conditions or benefits at any time. Many matters covered by this handbook are also described in separate official documents. These official documents always are controlling over any statement made in this handbook or by any supervisor or manager.

(Pl.'s L.R. 56(a)(2) Stmt. [Doc. # 34-2] ¶ 10; Seltzer Aff. Ex. F [Doc. # 31-5] at 14.) Under the heading, "Employment at Will," the introduction of the Handbook continues as follows on page four (on the second page of text in the Handbook):

> Your employment with us is "employment at will," and you and the Company are free to choose to end the work relationship at any time, with or without cause or notice. There is no "contract of employment" between the Company and any employee with the exception of some key executives, and nothing in this guide in any way expresses or implies such a contract. No one is authorized to provide any employee with an employment contract or special arrangement concerning terms or conditions of employment unless the contract or agreement is in writing and signed by the President of Digitas North America.

(Pl.'s L.R. 56(a)(2) Stmt. [Doc. # 34-2] ¶ 11; Seltzer Aff. Ex. F [Doc. # 31-5] at 15.) The heading "Employment at Will" is referenced in the table of contents on page two.

These statements—stating that the Handbook provides "guidelines only," and disclaiming Digitas's intention to form anything other than an at-will employment relationship—are consistent with, and reinforce, the statements in the offer letters. The statements are clear, unequivocal, and "sufficiently obvious as to be readily observable to any employee reviewing the

8

manual." *Cardona,* 1998 WL 246634, at *5 (finding that no contract was created by an employee handbook even when the disclaimer was located on the second page and was not labeled as a "disclaimer").

Mr. Wong argues that Digitas "failed to demonstrate that its disclaimer is sufficiently clear, conspicuous, and explicit to constitute a valid disclaimer and warrant an entry of summary judgment." (Pl.'s Opp. Br. [Doc. # 34-1] at 17.) In support of his argument, Mr. Wong cites cases in which Connecticut courts have denied motions for summary judgment, even when the handbooks contained disclaimers. As Digitas points out, these cases are distinguishable. For example, Mr. Wong cites *Elliff v. St. Vincent's Med. Ctr.*, No. CV91 28 92 82 S, 1993 WL 526587, at *1 (Conn. Super. Ct. Dec. 7, 1993), where the "personnel manual . . . contain[ed] a contractual disclaimer [that] [was] untitled, [was] not referenced in the manual's table of contents, [was] placed on the last page, and [was] in fine print." Similarly, in *Wasilewski v. Warner-Lambert Co.*, No. CV93 04 44 45, 1995 WL 373928, at *4 (Conn. Super. Ct. June 19, 1995), the "alleged disclaimer" was "on the last page of Warner-Lambert's employee handbook," was untitled, and lacked specificity. The courts denied summary judgment to the employers in both cases, finding that the disclaimers were insufficient. In contrast, the statements quoted above from the Handbook appear in regular sized font, on the second page of the Handbook's text (page four of the Handbook), under the heading "Employment at Will," which is referenced in the table of contents on page two of the Handbook. Thus, the language in the Handbook, together with the offer letters and Mr. Wong's deposition testimony, establishes that the parties did not intend alter the at-will employment relationship.

### 3. The Anti-Harassment Policy

Mr. Wong alleges that the Anti-Harassment policy (the "Policy") modified the at-will relationship and imposed a contractual obligation on Digitas to interview Mr. Wong in any harassment investigation in which he was accused of harassment, and that Digitas breached that obligation by failing to interview him before terminating his employment. The following additional facts are pertinent to this argument. Mr. Wong first acknowledged that he received and read the Policy by signing it on December 19, 2008. (Seltzer Aff. Ex. H [Doc. # 31-6] at 2.) Mr. Wong also acknowledged that he received the Policy, along with several other Digitas policies, by signing an acknowledgement on August 15, 2010. (Seltzer Aff. Ex. I [Doc. # 31-6] at 4.)[3]

Mr. Wong relies on the following paragraph of the Policy, which appears under the heading "Harassment Investigations,"

> When we receive the complaint we will promptly investigate the allegation in a fair and expeditious manner. The investigation will be conducted in such a way as to maintain confidentiality to the extent practicable under the circumstances. We will conduct a private interview with the person filing the complaint, witnesses, and the person alleged to have committed harassment. When we have completed our investigation, we will, to the extent appropriate, inform the person filing the complaint and the person alleged to have committed the conduct of the results of that investigation.

(Seltzer Aff. Ex. G [Doc. # 31-5] at 18-19.) Because he was the "person alleged to have committed harassment," Mr. Wong argues that the Policy required Digitas to interview him before terminating him. Mr. Wong distinguishes between the mandatory language (e.g., "we will") and the discretionary language (e.g., "to the extent appropriate") in that portion of the Policy, and argues that by stating "we will," without qualification, Digitas committed itself to "conduct a private interview with . . . the person alleged to have committed harassment." (Pl.'s

---

[3] Because both parties refer to a version of the Policy dated September 14, 2006, the Court assumes that the Policy did not change between September 2006 and August 2010. (*See* Seltzer Aff. Ex. G [Doc. # 31-5] at 17-20.)

10

Opp. Br. [Doc. # 34-1] at 14-15.) Mr. Wong also argues that this portion of the Policy was not sufficiently disclaimed. He contends that the Handbook's statement that "nothing in *this guide* in any way expresses or implies such a contract" (Seltzer Aff. Ex. F [Doc. # 31-5] at 14) (emphasis added) suggests that the Handbook disclaimer applies only to the Handbook and not to the Policy. (Pl.'s Opp. Br. [Doc. # 34-1] at 17-18.)[4]

Even if the Handbook disclaimer does not apply to the Policy, that does not suggest that the Policy imposed a contractual obligation on Digitas. "A contractual promise cannot be created by plucking phrases out of context; there must be a meeting of the minds between the parties." *Christensen v. Bic Corp.,* 18 Conn. App. 451, 458 (1989). "[J]ust because a plaintiff believes certain provisions constitute a contract does not bind the defendant without evidence that the defendant actually intended to be bound by such a contract." *Foster v. Massachusetts Mut. Life Ins. Co.,* No. CIV. 3:02CV1433 (PCD), 2004 WL 950827, at *5 (D. Conn. Apr. 14, 2004).

Read as a whole, the Policy does not contradict the offer letters or the Handbook disclaimers regarding an at-will employment relationship. A contract "should be read to give effect to all its provisions and to render them consistent with each other." *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995). Thus, unless there are contradictory

---

[4] The Court notes that this position contradicts Mr. Wong's deposition testimony, in which he asserted that the Policy was part of the Handbook. Mr. Wong testified that Mr. Murata "didn't follow Digitas *handbook* procedure" when Mr. Murata "decided to unilaterally terminate [Mr. Wong's] employment without interviewing [him] after a complaint was filed against [Mr. Wong], nor did he follow regular procedure. . ." (Wong Tr. [Doc. # 31-3] at 27) (emphasis added). He testified that Mr. Murata "not only should have" interviewed him, "that was stated in the Digitas *handbook*, as [his] right." (Wong Tr. [Doc. # 34-5] at 62) (emphasis added). Mr. Wong stated that his breach of contract claim "refers to the Digitas *handbook*, specifically to its harassment policy. It's very clear in its language that when a harassment complaint is brought against an employee, a thorough investigation would be conducted . . ." (Wong Tr. [Doc. # 31-3] at 69-70) (emphasis added). Finally, Mr. Wong was asked, if, in his breach of contract claim, he was referring to any contract "[o]ther than the harassment policy of the Digitas *handbook*" (emphasis added), and he responded in the negative. (*Id.* at 70.)

terms, the Policy should be read to be consistent with the offer letters and the Handbook, and individual phrases should not be read out of context.

Mr. Wong's argument omits critical language of the Policy. The portion of the Policy that precedes the description on investigations states that the Policy simply "sets forth [Digitas's] goals of promoting a workplace free of harassment," and "is not designed or intended to limit [Digitas's] authority to discipline or take remedial action for workplace conduct which [it] deem[s] unacceptable, regardless of whether that conduct satisfies the definition of harassment." (Seltzer Aff. Ex. G. [Doc. # 31-5] at 17.) "Where it is determined that such inappropriate conduct has occurred, [Digitas] will act promptly to eliminate the conduct and impose such corrective action as is necessary, including disciplinary action where appropriate." (*Id.*)

This language makes clear that by adopting the Policy, Digitas did not "limit [its] authority" to deal with workplace harassment, and did not assume any contractual obligations to alleged harassers, including as to the manner in which it would carry out investigations. Read as a whole, there is nothing in the Policy suggesting an intent to modify Mr. Wong's at-will employment relationship.

Reinforcing this conclusion is the express linkage between Digitas's December 2008 offer letter to Mr. Wong and the Policy. The December 2008 offer letter, which described an at-will employment relationship in clear terms, stated that "joining Digitas is contingent upon filling out" certain forms, including the Policy. (Seltzer Aff. Ex. B [Doc. # 31-3] at 8.) The fact that the offer letter incorporated the Policy by reference strongly suggests that the parties did not intend that one would contradict the other.

As Digitas points out, the undisputed evidence in the record shows that it acted in accordance with its statement in the policy, "promptly to eliminate" Mr. Wong's conduct—

which it deemed unacceptable—by terminating his employment, as it determined to be "necessary" and appropriate." (Def.'s Reply Br. [Doc. # 35] at 8.) Because the offer letters, the Handbook, and the Policy—when read together—do not suggest that Mr. Wong's employment at Digitas was anything but at-will, there is no genuine issue of material fact as to whether Digitas had a contractual obligation to interview Mr. Wong—or anyone else—before terminating him when he was accused of harassment.

Finally, unlike employee handbooks and personnel manuals, which may, under certain circumstances, create contracts between employers and employees, anti-harassment policies generally do not create contracts because they are required by law. State and federal laws require employers to create and disseminate anti-harassment policies and complaint procedures in order to defend themselves from vicarious liability by showing that they exercised "reasonable care to prevent and correct promptly any sexually harassing behavior." *Faragher v. City of Boca Raton*, 524 U.S. 775, 808 (1998). And in this case, there is evidence that Mr. Wong understood that the Policy was created to comply with the law rather than to embody a contractual commitment to employees accused of harassment. In 2008, he signed a note that was attached to the Policy that stated that "Massachusetts employers are required to establish and distribute a detailed and comprehensive sexual harassment policy, including a description of the process for filing complaints." (Seltzer Aff. Ex. H [Doc. # 31-6] at 2; M.G.L.A. 151B § 3A.[5]) Thus, the Policy

---

[5] Mass. Gen. Laws Ann. 151B § 3A(b) provides, in relevant part, that every employer shall:
(1) adopt a policy against sexual harassment which shall include:
    (i) a statement that sexual harassment in the workplace is unlawful;
    (ii) a statement that it is unlawful to retaliate against an employee for filing a complaint of sexual harassment or for cooperating in an investigation of a complaint for sexual harassment;
    (iii) a description and examples of sexual harassment;
    (iv) a statement of the range of consequences for employees who are found to have committed sexual harassment;
    (v) a description of the process for filing internal complaints about sexual harassment and the work addresses and telephone numbers of the person or persons to whom complaints should be made; and

"does not indicate that [Digitas] is undertaking any contractual obligations towards [Mr. Wong]; rather it obliges [Digitas] to comply with federal and state anti-discrimination laws, and to undertake an investigation upon receiving complaints of discrimination and/or harassment." *Byra-Grzegorczyk*, 572 F. Supp. 2d at 254 (internal quotation marks and citations omitted). "As any promises in the policy are general statements of adherence to the anti-discrimination laws, standing alone they do not create a separate and independent contractual obligation." *Peralta,* 123 F. Supp. at 84.

### 4. Plaintiff Fails to Defeat Summary Judgment Under Rule 56(d)

Mr. Wong also argues that "it is unclear to Plaintiff whether another of Defendant's policies, referred to as the 'Janus Book' in the Handbook, imposes contractual liability upon either party." (Pl.'s Opp. Br. [Doc. # 34-1] at 15.) According to the Handbook, "[t]he Janus Book is a manual that provides the principles and standards of conduct and behavior for every employee," and was accessible from the Digitas Portal. (Selzer Aff. Ex. F [Doc. # 31-5] at 14.) "Among other important policies in the Janus Book are the Code of Conduct (1.02) and the Complaint Procedure for Accounting and Auditing Matters (1.05.02). The Code of Conduct defines the standard of behavior which all employees must observe." (*Id*.) Mr. Wong notes that he requested copies of all handbooks, agreements, and other policies from Digitas, but never received a copy of the Janus Book, "nor did Defendant provide Plaintiff with any documents of evidence of Plaintiff acknowledging in writing that Plaintiff received or agreed to any Janus Book terms and conditions." (Pl.'s Opp. Br. [Doc. # 34-1] at 18 n.3.) Digitas did not respond to these claims, and did not mention the "Janus Book" in its papers.

---

      (vi) the identity of the appropriate state and federal employment discrimination enforcement agencies, and directions as to how to contact such agencies.
(2) provide annually to all employees an individual written copy of the employer's policy against sexual harassment; provided, however, that a new employee shall be provided such a copy at the time of his employment.

Mr. Wong, however, did not file a motion to compel Digitas to provide a copy of the "Janus Book," or otherwise invoke this Court's procedures for resolving discovery disputes. *See* United States District Judge Michael P. Shea, Instructions for Discovery Disputes, http://ctd.uscourts.gov/sites/default/files/forms/MPSDiscovery%20Dispute%20Instructions%20%28for%20website%29Revised%204.10.14.pdf. Nor did Mr. Wong submit affidavits or declarations suggesting that the facts related to the Janus Book are essential to justify his opposition to summary judgment, as permitted by Fed. R. Civ. P. 56(d). Rule 56(d), formerly Rule 56(f), sets forth the process by which a party opposing summary judgment may oppose the motion by requesting further discovery. "If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d).[6] "[T]he failure to file an affidavit under Rule 56[(d)] is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137 (2d Cir. 1994). Mr. Wong did not file such an affidavit, and his mere reference to the need for additional discovery is insufficient to defeat summary judgment. Further, he does not even suggest the Janus Book would help his claims here. In fact, he acknowledges that he is not aware of any evidence that it would do so. (Pl.'s Opp. Br. [Doc. # 34-1] at 18 n.3.) Therefore, the Court grants Digitas summary judgment on Count One.

### B. Breach of Covenant of Good Faith and Fair Dealing (Count Two)

"Every contract carries an implied covenant of good faith and fair dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of the

---

[6] The affidavit must include "(1) what facts are sought and how they are to be obtained; (2) how these facts are reasonably expected to raise a genuine issue of material fact; (3) what efforts the affiant has made to obtain them; and (4) why the affiant's efforts were unsuccessful." *Gualandi v. Adams*, 385 F.3d 236, 244 (2d Cir. 2004).

15

agreement." *Habetz v. Condon*, 224 Conn. 231, 238 (1992). However, an "at-will employee may successfully challenge his dismissal" as a breach of the covenant of good faith and fair dealing only in "the situation where the reason for his discharge involves impropriety . . . derived from some important violation of public policy." *Magnan v. Anaconda Indus., Inc.*, 193 Conn. 558, 572 (1984) (internal quotation marks and citations omitted). Since the Court has determined that Mr. Wong was an at-will employee, he must show that his termination violated an important public policy. Mr. Wong does not allege a single violation of public policy related to his termination. Therefore, the Court grants Digitas summary judgment on Count Two.

## IV.  CONCLUSION

For the foregoing reasons, the Court grants Defendant's motion for summary judgment [Doc. #31] in its entirety and dismisses the complaint.

IT IS SO ORDERED.

/s/
Michael P. Shea, U.S.D.J.

Dated:   Hartford, Connecticut
         January 5, 2015